[No. B149679. Second Dist., Div. Seven. Feb. 20, 2002.]

ADRIENNE RUBIN, Plaintiff and Appellant, v.
UNITED AIR LINES, INC., Defendant and Respondent.

**COUNSEL**

Steven A. Blum for Plaintiff and Appellant.

Dwyer, Daly, Brotzen & Bruno, Peter P. Brotzen and Gregory L. Anderson for Defendant and Respondent.

**OPINION**

**JOHNSON, Acting P. J.**—An airline passenger brought suit against an airline and others after Los Angeles Police Department officers removed her from a commercial flight about to depart for Hawaii. Her suit alleged causes of action for false arrest, false imprisonment, assault, battery and emotional distress. The airline claimed it was entitled to summary judgment as a matter

of law because a provision of the Airline Deregulation Act of 1978 expressly preempted her state law tort claims.[1] In the alternative, the airline claimed it was also entitled to judgment as a matter of law because it acted within its statutory discretion by refusing to transport a passenger it decided was, or might be, inimical to airline safety.[2] The trial court granted summary judgment in favor of the airline.

We hold a passenger who the airline believes is, or might become, inimical to the safety of the aircraft or its passengers may be ejected from a flight without subjecting the airline to tort liability if at the time airline personnel had a reasonable basis for believing the passenger presented a safety risk. We further conclude the airline's actions in this case were reasonable as a matter of law. Accordingly, we affirm the summary judgment.

### FACTS AND PROCEEDINGS BELOW

Appellant, Ms. Adrienne Rubin, decided to join her husband, Stanford Rubin, a trusts and estates attorney who was then in Hawaii. She purchased an airline ticket from respondent United Airlines, Inc. (United). She paid for a coach ticket and upgraded the ticket to first class by using her husband's frequent flyer miles.

On October 28, 1998, Ms. Rubin arrived at the Los Angeles International Airport approximately an hour before the plane was scheduled to depart. She went directly to the gate with her bags.

She waited in line a long time before she could present her ticket to the agent at the gate. Ms. Rubin had a first class itinerary card with a seat designation of 2F. However, the United computer showed no first-class reservation for her. The agent explained Ms. Rubin needed to surrender an additional 3,000 frequent flyer miles to qualify for a first-class upgrade because, for some reason, 3,000 miles had been recredited to her husband's account. The agent directed Ms. Rubin to the customer service counter nearby.

Approximately 30 minutes remained before the flight for Hawaii was to depart. It took nearly 15 minutes for Ms. Rubin to reach the front of the line at the customer service counter. When the United agent finally located Ms. Rubin's frequent flyer account on the computer she discovered Ms. Rubin did not have the needed 3,000 miles in her account. Ms. Rubin told the agent

---

[1] Title 49 United States Code section 41713(b)(1).
[2] Title 49 United States Code section 44902(b).

to take the miles from her husband's account. Only 10 or so minutes remained before the plane was due to take off. The agent told Ms. Rubin to go to the gate while she continued to try to locate Mr. Rubin's frequent flyer account number.

Ms. Rubin went to the gate and told the gate agent she had a first-class seat and wanted to board. The agent responded all first-class seats on the flight had already been assigned. He explained the flight was very full but two or three seats were available in the coach section. The agent offered Ms. Rubin the option of taking one of the seats in coach or flying first class on a later flight. He apparently did not indicate a specific coach seat assignment. Ms. Rubin explained she had to leave on this flight because she and her husband had an engagement later in the day she did not want to miss. Ms. Rubin was adamant about wanting a first-class seat, and on this particular flight.

The gate agent notified the service director on board there was a person about to board who was insisting on leaving on this flight and insisting on a first-class seat. The service director decided he would at least accommodate Ms. Rubin's wishes to leave on this flight.

The service director met Ms. Rubin in the jetway. Ms. Rubin told the service director she had a first-class ticket, a seat assignment of 2F, and could not understand why the airline had given her seat away. Ms. Rubin told the service director she had to fly first class because she had a special diet. The director reiterated all first class seats were now assigned and occupied. He explained if she wanted to take this fight she would have to fly coach in seat 26B.

Ms. Rubin entered the plane. She did not go to seat 26B in coach. According to Ms. Rubin, the service director did not specify any particular seat but told her she could sit anywhere in coach. Instead, Ms. Rubin entered (or attempted to enter) the first-class cabin to determine for herself whether seat 2F was in fact occupied. As the service director put it, "that's when the hair came up on the back of my neck, because, . . . you're violating everything that it's about, because it was clearly stated to Mrs. Rubin that the first-class seats were full."

The purser of an aircraft has primary responsibility for the safety of the passengers and has ultimate authority over the other flight attendants. When she saw Ms. Rubin enter (or attempt to enter) the first-class cabin, the purser, according to Ms. Rubin, "went ballistic." Ms. Rubin got into a lengthy and loud discussion with the purser. The service director intervened and again

directed Ms. Rubin to take her seat in 26B. Instead, Ms. Rubin dropped her luggage in the doorway of the aircraft and took a bulkhead emergency row seat immediately behind the first-class section. The service director told Ms. Rubin to store her bag. Ms. Rubin refused and told the director he could do it himself or have someone else store the bag if he wished. The service director and another stewardess repeatedly told Ms. Rubin she could not sit in row 9 either, both because she had been assigned seat 26B, and because she was not "emergency row qualified."

The service director left to consult with the purser. The purser, in the meantime, had already talked to the captain. The purser told the captain she had an irate passenger on board who refused to follow directions and who had attempted to make an unauthorized entry into the first-class section. Based on the purser's representations, the captain agreed Ms. Rubin's demeanor and refusal to follow directions had the potential to create a safety problem in flight. The purser told the service director she would not fly if Ms. Rubin remained on board. The captain, purser and service director decided Ms. Rubin should be deplaned.

When the service director returned to the cabin Ms. Rubin was no longer sitting in row 9. She was instead sitting in another person's seat who had been in the lavatory. The person whose seat Ms. Rubin occupied was now sitting on the armrest of an aisle seat. The service director told Ms. Rubin she would have to deplane. In response, she instead finally took her assigned seat in 26B. By this time the flight was at least 15 minutes past schedule for takeoff. The other passengers were becoming impatient and unruly. Some yelled at United personnel suggesting they do something to regain control of the situation.

A gate agent came on board to take Ms. Rubin off the plane. Ms. Rubin was talking loudly on her cell phone. She refused to acknowledge his presence or mission. He could not get Ms. Rubin to pay attention to him or to stop talking on the telephone. He left the plane in frustration. Now the flight was some 20 to 25 minutes past departure time. United personnel decided to call the Los Angeles Airport Police.

Passengers started applauding when the police officers boarded the plane. The Los Angeles police officers asked Ms. Rubin to leave the plane. Ms. Rubin kept interrupting to explain she believed she had a first-class seat assignment and could not understand why United had given her seat away. The officers told Ms. Rubin the airplane was not going to take off with her on it. Ms. Rubin refused to leave the plane voluntarily. She refused to leave her seat, refused to stand up and refused to walk. The officers had to pick

Ms. Rubin up out of her seat and carry her by her shoulders off the plane. As they proceeded in this fashion through the aisles passengers applauded and whistled. They also yelled and hurled wads of paper at Ms. Rubin.

In the view of one officer, the situation on board was "a mob scene." He believed the other passengers were so frustrated and upset with Ms. Rubin because of the trouble and delay, he believed if United had permitted Ms. Rubin to stay on the flight "it could have gotten ugly."

The officers took Ms. Rubin off the plane. Her luggage was still where she had dropped it in the doorway. The service director removed her bag to the jetway.

The officers detained Ms. Rubin at the police station for several hours. The officers contacted the Federal Aviation Administration and the Federal Bureau of Investigations as is required when investigating a potential federal charge of obstructing a flight crew. A representative from the Federal Aviation Administration arrived and interviewed Ms. Rubin, as did a sergeant from the Los Angeles Police Department. Ultimately, Ms. Rubin was not charged. The officers returned Ms. Rubin to the airport and she flew first class on the next flight to Hawaii.

Ms. Rubin filed suit against United, the City of Los Angeles, and the Los Angeles police officers who removed her from the plane.[3] Her complaint alleged causes of action for false arrest, false imprisonment, unlawful search and seizure, assault, battery, and emotional distress. United moved for summary judgment claiming Ms. Rubin's state tort law causes of action were expressly preempted by the Airline Deregulation Act. In the alternative, United claimed it was entitled to judgment as a matter of law in any event, asserting it had acted within the broad discretion accorded airlines by federal law to decide when a passenger presents a security risk sufficient to be removed from a flight. United argued there were no material factual disputes and asserted it was thus entitled to judgment as a matter of law.

The trial court granted United's motion and this appeal followed.

## DISCUSSION

### I. Standard of Review of a Summary Judgment.

"Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the

---

[3]The City of Los Angeles and the named Los Angeles Police Department officers have since settled with Ms. Rubin and are not parties to this appeal.

action or proceeding."[4] "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence . . . and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted . . . on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact."[5]

A defendant meets his or her burden of proof by demonstrating "one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action."[6] The defendant need not conclusively negate an element of the plaintiff's cause of action, but must only show one or more of its elements cannot be established.[7] The burden of proof at trial is relevant to the burden of production borne by the defendant moving for summary judgment. "[I]f a defendant moves for summary judgment against [a plaintiff who would bear the burden of proof by a preponderance of evidence at trial, the defendant] must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not. . . ."[8] The defendant can satisfy its burden either by producing evidence which negates an element of the cause of action, or by showing, through the plaintiff's deficient discovery responses, the plaintiff does not possess, and cannot reasonably obtain, evidence to establish the particular element.[9]

"Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists . . . ."[10] In opposing the motion, the plaintiff may not simply rely on allegations or denials of the pleadings, but must set forth specific facts showing a triable issue of material fact exists.[11]

"There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the

---

[4]Code of Civil Procedure section 437c, subdivision (a).

[5]Code of Civil Procedure section 437c, subdivision (c); *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028 [37 Cal.Rptr.2d 431].

[6]Code of Civil Procedure section 437c, subdivision (o)(2).

[7]*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].

[8]*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 851.

[9]*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pages 853-854.

[10]Code of Civil Procedure section 437c, subdivision (o)(2).

[11]Code of Civil Procedure section 437c, subdivision (o)(2); *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580-581, 593 [37 Cal.Rptr.2d 653].

party opposing the motion in accordance with the applicable standard of proof."[12] Although "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*."[13] "If a party moving for summary judgment . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination," the motion should be granted.[14]

■    On appeal from an order granting summary judgment we independently assess the correctness of the trial court's ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law.[15] In doing so we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the opposing party.[16]

We review the trial court's grant of summary judgment in favor of United with these standards in mind.

II.   *Decisional Law Is Unsettled, and Thus Inconclusive, Which State Law Tort Claims Are Preempted by Federal Law.*

The Airline Deregulation Act of 1978 (ADA) prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ."[17] This case concerns the scope of this preemptive provision as applied to a suit raising state tort law claims regarding, as United alleges, claims arising from its boarding procedures. United claims "boarding procedures" are classified as a "service" and state claims challenging this airline service are expressly preempted by federal law. Ms. Rubin, by contrast, claims the airline gives a too all-encompassing reading to the term "service." She argues Congress used "service" in the public utility sense to only refer to the provision of air transportation to and from various markets at various

---

[12]*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 850.

[13]*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 856.

[14]*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 855.

[15]Code of Civil Procedure section 437c, subdivision (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].

[16]*Gomez v. Ticor* (1983) 145 Cal.App.3d 622, 627 [193 Cal.Rptr. 600].

[17]Title 49 United States Code section 41713(b)(1).

times.[18] She asserts her claims do not affect these services and thus are not preempted by the ADA.

Until 1978, the Federal Aviation Act of 1958 (FAA)[19] empowered the Civil Aeronautics Board (CAB) to regulate the interstate airline industry. Before 1978 the FAA contained no clause preempting state regulation. In fact, the FAA contained a savings clause stating: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."[20]

Thereafter, Congress determined relying on competitive market forces rather than pervasive federal regulation would further efficiency, low prices, variety and quality. Thus, in 1978 Congress enacted the ADA, which largely deregulated domestic air transport. To prevent states from "un[doing] federal deregulation with regulation of their own,"[21] the ADA included a pre-emption clause. This clause now states in pertinent part: "(b) Preemption. (1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a *price, route, or service* of an air carrier that may provide air transportation under this subpart [49 United States Code section 41101 et seq.]."[22]

The United States Supreme Court has twice addressed the scope of the ADA's preemption clause. In *Morales v. Trans World Airlines, Inc.*[23] the court addressed the question whether airlines were subject to states' laws banning deceptive advertising. The court concluded state restrictions on advertising were precisely the type of economic regulation Congress intended to preempt in deregulating the airline industry. "Restrictions on advertising 'serve to increase the difficulty of discovering the lowest cost

---

[18]Citing, *Charas v. Trans World Airlines, Inc.* (9th Cir. 1998) 160 F.3d 1259, 1265-1266.

[19]72 Statutes 731, as amended, 49 United States Code Appendix section 1301 et seq.

[20]Originally title 49 United States Code Appendix section 1506, recodified at 49 United States Code section 40120(c); see *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219, 222 [115 S.Ct. 817, 820-821, 130 L.Ed.2d 715].

[21]*Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 378 [112 S.Ct. 2031, 2034, 119 L.Ed.2d 157].

[22]Formerly 49 United States Code Appendix section 1305(a)(1), reenacted as 49 United States Code section 41713(b)(1) without substantive change (Pub.L. No. 103-272 (July 5, 1994) 108 Stat. 1143, § 1(e)). Italics added.

[23]*Morales v. Trans World Airlines, Inc., supra,* 504 U.S. 374.

seller . . . and [reduce] the incentive to price competitively.' . . ."[24] The court held states' action for deceptive advertising had the "forbidden significant effect" on "price" and were thus preempted by the ADA.[25]

Although the court did not define the precise perimeters of the ADA's preemption clause, the court noted not all state law claims would be preempted. "[W]e do not . . . set out on a road that leads to pre-emption of state laws against gambling and prostitution as applied to airlines. . . . '[s]ome state actions may affect [airline fares] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect."[26]

The court again explored the boundaries of the ADA's preemption clause in *American Airlines, Inc. v. Wolens*.[27] In reviewing the airline's unilateral decision to devalue the plaintiffs' frequent flyer miles the court commented, "[w]e need not dwell on the question whether plaintiffs' complaints state claims 'relating to [air carrier] rates, routes, or services.' . . . Plaintiffs' claims relate to 'rates,' *i.e.*, American's charges in the form of mileage credits for free tickets and upgrades, and to 'services,' *i.e.*, access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and blackout dates."[28]

The court nevertheless concluded the plaintiffs' "routine breach-of-contract" claims were not preempted.[29] "We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations 'and thus do not amount to a State's "enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law" within the meaning of [the ADA's preemption clause.]' "[30] Reading the ADA's preemption clause together with the ADA's savings clause retaining existing statutory and common law remedies, made clear the ADA only "stops States from imposing their own substantive standards with respect to rates, routes, or services,

---

[24]*Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at page 388 [112 S.Ct. at page 2039].

[25]*Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at page 388 [112 S.Ct. at page 2039].

[26]*Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at page 390 [112 S.Ct. at page 2040].

[27]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. 219.

[28]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. at page 226 [115 S.Ct. at page 823].

[29]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. at page 232 [115 S.Ct. at pages 825-826].

[30]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. at pages 228-229 [115 S.Ct. at page 824].

but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated."[31]

Although the court touched briefly on the meaning of the term "service" in the ADA's preemption clause,[32] it has not directly addressed the term's precise scope. Intermediate appellate courts have taken widely divergent views in their interpretation of the term "service." Some courts define the term quite narrowly. This narrower interpretation is exemplified by the Ninth Circuit Court of Appeals decision in *Charas v. Trans World Airlines, Inc.*[33] The court's *Charas* decision involved a series of consolidated cases all involving claims against airlines for personal injuries. The Ninth Circuit held the term "service" encompasses " 'the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail,' " but not the " 'provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities.' "[34] The Third Circuit Court of Appeals has expressly agreed with the Ninth Circuit's definition.[35]

Other circuits, by contrast, have adopted a much more expansive definition of the term "service." This broader definition is typified by the Fifth Circuit's decision in *Hodges v. Delta Airlines, Inc.*[36] In *Hodges* a passenger filed suit against the airline for personal injuries he received when a case of rum fell from the overhead bin and injured him. The *Hodges* court found claims for personal injuries were not preempted because it defined "service" in terms of the contractual features of air transportation. It included within this definition of "service" items "such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself."[37] According to the *Hodges* court, "[t]hese matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air transportation that we believe Congress intended to deregulate as 'services' and broadly to protect from state regulation."[38] A few

---

[31]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. at pages 232-233 [115 S.Ct. at page 826].

[32]*American Airlines, Inc. v. Wolens, supra*, 513 U.S. at page 226 [115 S.Ct. at page 823] (the term "service" encompasses "access to flights and class-of-service upgrades").

[33]*Charas v. Trans World Airlines, Inc., supra*, 160 F.3d 1259.

[34]*Charas v. Trans World Airlines, Inc., supra*, 160 F.3d at page 1261.

[35]See *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.* (3d Cir. 1998) 164 F.3d 186, 193.

[36]*Hodges v. Delta Airlines, Inc.* (5th Cir. 1995) 44 F.3d 334, 336.

[37]*Hodges v. Delta Airlines, Inc., supra*, 44 F.3d at page 336.

[38]*Hodges v. Delta Airlines, Inc., supra*, 44 F.3d at page 336.

federal circuit courts are in accord with the broader definition of "service" adopted by the *Hodges* court.[39]

Division One of this district's Court of Appeal has essentially adopted the so-called majority view as expressed in the *Hodges* opinion. In *Romano v. American Trans Air*[40] the court concluded the ADA does not preclude a personal injury action for damages suffered as the result of a flight attendant's failure to restrain one passenger from attacking another. In reaching its conclusion the *Romano* court noted the following factors: (1) the ADA does not expressly preempt personal injury actions; (2) the ADA's savings clause preserved common law and statutory remedies; (3) the ADA requires an air carrier to have insurance in an amount prescribed by the Department of Transportation to cover claims for personal injuries and property losses " 'resulting from the operation or maintenance of aircraft' " which the court noted would be unnecessary if personal injury claims were preempted.[41] Although the *Romano* court did not purport to classify the types of claims against an airline which would be preempted as a "service," the court noted, in 1979 the department charged with enforcing the ADA (formerly the CAB, now the Department of Transportation) interpreted the ADA "to preempt economic factors 'that go into the provision of the quid pro quo for passenger's fare, including flight frequency and timing, liability limits, reservation and boarding practices, insurance, smoking rules, meal service, entertainment, bonding and corporate financing . . . .' "[42]

United urges this court to adopt the broadly preemptive definition of "service" of the *Hodges* lines of cases. In the alternative, United suggests we follow Division One of this court and, as mentioned in dicta in *Romano*, find the present case involves "boarding procedures," and thus an airline "service" preempted by 49 United States Code section 41713, part of the ADA.

---

[39]See, e.g., *Smith v. Comair, Inc.* (4th Cir. 1998) 134 F.3d 254, 259 ("Undoubtedly, boarding procedures are a service rendered by an airline"); *Travel All Over The World, Inc. v. Kingdom of Saudi Arabia* (7th Cir. 1996) 73 F.3d 1423, 1433 (same).

[40]*Romano v. American Trans Air* (1996) 48 Cal.App.4th 1637 [56 Cal.Rptr.2d 428].

[41]*Romano v. American Trans Air, supra,* 48 Cal.App.4th 1637, 1643, footnote omitted ("Since there is no provision in the ADA for personal injury or property damage lawsuits, it follows ineluctably that liability insurance would be unnecessary if an injured passenger could not sue an airline for damages—and that, therefore, Congress intended that airlines respond to common law claims for personal injury damages.") (Citing *American Airlines, Inc. v. Wolens, supra,* 513 U.S. at p. 231, fn. 7 [115 S.Ct. at p. 825]; *Hodges v. Delta Airlines, Inc., supra,* 44 F.3d at p. 338.)

[42]*Romano v. American Trans Air, supra,* 48 Cal.App.4th at page 1642, citing 44 Federal Register 9948, 9951 (Feb. 15, 1979).

Ms. Rubin, by contrast, urges the narrower interpretation of the Ninth Circuit in *Charas* and requests this court to find her state law tort claims not preempted by the ADA.

We need not decide which of the competing definitions of "service" most accurately reflects Congress's intent in adopting 49 United States Code section 41713. Regardless of the types of state claims which should be preempted under the rubric of "services" in the ADA, we conclude United properly exercised the discretion given it in section 44902 of the FAA to refuse Ms. Rubin passage in the circumstances presented in this case.

III.   *The Undisputed Facts Establish as a Matter of Law United Had a Reasonable Belief Ms. Rubin Was or Could Be Inimical to the Safety of the Flight Which Justified United in Refusing Her Passage.*

Former section 1111, now 49 United States Code section 44902, of the FAA, was originally enacted by Congress in 1961. This provision authorizes an airline to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."[43] Congress originally enacted this provision to help combat an air piracy problem.[44] However, 49 United States Code section 44902 is not, as Ms. Rubin suggests, reserved strictly for would-be terrorists and hijackers. Airlines have also invoked their

---

[43]Title 49 United States Code section 44902 now provides:

"(a) Mandatory refusal.—The Administrator of the Federal Aviation Administration shall prescribe regulations requiring an air carrier, intrastate air carrier, or foreign air carrier to refuse to transport—

"(1) a passenger who does not consent to a search under section 44901(a) of this title establishing whether the passenger is carrying unlawfully a dangerous weapon, explosive, or other destructive substance; or

"(2) property of a passenger who does not consent to a search of the property establishing whether the property unlawfully contains a dangerous weapon, explosive, or other destructive substance.

"(b) *Permissive refusal.—Subject to regulations of the Administrator, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.*

"(c) Agreeing to consent to search.—An agreement to carry passengers or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier is deemed to include an agreement that the passenger or property will not be carried if consent to search the passenger or property for a purpose referred to in this section is not given." (Italics added.)

[44]See 1 United States Code Congressional and Administrative News (1961) 87th Congress, 1st Session, pages 520-522; 2 United States Code Congressional and Administrative News (1961) 87th Congress, 1st Session, pages 2563-2582.

discretion under this statute, as they have under common law,[45] to exclude passengers in any number of circumstances.[46]

On the other hand, although the discretion given an airline under this provision to refuse to transport a passenger for safety reasons is "decidedly expansive, [it] is not unfettered."[47] If an airline's refusal of transportation is arbitrary or capricious, its refusal can give rise to a claim by the offended passenger for damages.[48] Stated another way, the decision to accept or refuse transport to a passenger based on considerations of safety and security "lies exclusively with the air carrier" and if such discretion is "exercised in good faith and for a rational reason" it will be upheld.[49]

One of the leading cases interpreting this provision is the Second Circuit's decision in *Williams v. Trans World Airlines*.[50] In *Williams* the FBI informed the airline a passenger arriving in Detroit on its London flight had an

---

[45]As the Second Circuit Court of Appeals noted in *Williams v. Trans World Airlines*, an airline's duty to perform its services with the highest possible degree of safety in the public interest has both a statutory and common law basis. All commercial airlines are common carriers, and as such, owe a duty of utmost care for their safety. (*Williams v. Trans World Airlines* (2d Cir. 1975) 509 F.2d 942, 946, fn. 8; [an airline's statutory authority to exclude a passenger is consistent with the "common law rule that 'where a carrier has reasonable cause to believe and does believe, that the safety or convenience of its passengers will be endangered by a person who presents himself for transportation, it may refuse to accept such person for transportation and is not bound to wait until events have justified its belief.' 14 Am.Jur.2d, Carriers, § 865 at 309."] see also *Cordero v. CIA Mexicana de Aviacion S.A.* (9th Cir. 1982) 681 F.2d 669, 672, fn. 3.

[46]See, for example, *Cordero v. CIA Mexicana de Aviacion, S.A., supra*, 681 F.2d 669 [airline did not allow passenger to re-board because it believed he was the passenger who had offended the pilot]; *Smith v. Comair, Inc., supra*, 134 F.3d 254 [passenger refused permission to reboard because he did not have photo identification]; *Adamsons v. American Airlines, Inc.* (1982) 58 N.Y.2d 42 [457 N.Y.S.2d 771 [444 N.E.2d 21] [airline acted within its discretion in refusing transport to a paralyzed person unaccompanied by an assistant who had a catheter and Foley disposal bag attached to her body and when seated in a wheelchair constantly cried out in excruciating pain].

[47]*O'Carroll v. American Airlines, Inc.* (5th Cir. 1989) 863 F.2d 11, 12.

[48]See, for example *Smith v. Comair, Inc., supra*, 134 F.3d at page 259, in which the court held: "Suits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the ADA if the conduct too tenuously relates or is unnecessary to an airline's service. [Citation.] If, for example, an airline held a passenger without a safety or security justification, a claim based on such actions would not relate to any legitimate service and would not be preempted." (See also *Cordero v. CIA Mexicana de Aviacion, S.A., supra*, 681 F.2d at pp. 671-672 [jury could have concluded airline acted unreasonably when it excluded the passenger "without even the most cursory inquiry into the complaint against him"].)

[49]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d at page 47 [444 N.E.2d at page 24].

[50]*Williams v. Trans World Airlines, supra*, 509 F.2d 942 (*Williams*).

outstanding warrant for his arrest, had previously been diagnosed as schizophrenic, and might be met at the airport with a demonstration.[51] Although the airline found the passenger compliant and unarmed, it decided to rely on the FBI report to deny Williams transport out of London. Williams brought suit claiming the airline's decision to exclude him was unreasonable and was instead motivated by racial discrimination.[52] He argued the FBI information was so inaccurate on its face it should have put the airline on inquiry to make an exhaustive investigation of the facts before acting to exclude him. The court of appeals affirmed a finding Williams's exclusion from the aircraft was not motivated by racial or political prejudice, holding the airline had a right to accept the FBI report at face value. In reaching this conclusion, the court found a carrier may exercise its discretion to exclude a passenger so long as the carrier acts on evidence which "would cause a reasonably careful and prudent air carrier of passengers to form the opinion that the presence aboard a plane of the passenger-applicant 'would or might be inimical to safety of flight.' "[53]

The *Williams* court rejected the plaintiff's assertion the airline should have conducted a thorough investigation into the FBI report for accuracy before refusing him transportation. Instead the court stated the airline's decision should be judged on the basis of the facts as known to the airline at the time, and without regard to hindsight. "Congress was certainly aware that decisions under § 1511 [(now § 44902)] would in many instances probably have to be made within minutes of the plane's scheduled take-off time, and that the carrier's formulation of opinion would have to rest on something less than absolute certainty. The statute did not contemplate that the flight would have to be held up or cancelled until certainty was achieved. The test of whether or not the airline properly exercised its power under § 1511 [(now § 44902)] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight. . . ."[54]

Many courts have since applied the *Williams* standard or a variant to test the reasonableness of an airline's decision to refuse passage. Circumstances justifying an airline's decision to refuse passage follow no consistent pattern.

---

[51]*Williams, supra,* 509 F.2d at page 944.
[52]*Williams, supra,* 509 F.2d at page 946.
[53]*Williams, supra,* 509 F.2d at page 948.
[54]*Williams, supra,* 509 F.2d at page 948.

For example, *Adamsons v. American Airlines, Inc.*[55] did not present what one might consider to be a typical safety risk. In *Adamsons* a passenger with paralyzed legs, suffering from an undiagnosed disease, yet having arranged for no special assistance on the flight, arrived at the airport in an ambulance with a catheter and a Foley disposal bag attached to her body. She repeatedly cried out in pain as airline personnel attempted to board her in a wheelchair. New York's state's highest court held the airline did not abuse its discretion under what is now 49 United States Code section 44902 in refusing to transport her. The plaintiff when purchasing her ticket had informed the airline she was paralyzed, needed a wheelchair, and was not contagious. However, the airline did not discover the extent of her illness until 45 minutes before departure time. The passenger was then traveling alone and airline personnel had no idea what assistance she might require during the several hour flight from Haiti to New York. With so little time remaining before departure it was impossible for airline personnel to thoroughly investigate the patient's condition.[56]

The court held in the circumstances the airline's decision to refuse passage was reasonable as a matter of law.[57] The court noted an airline usually must make such decisions on the spur of the moment, shortly before takeoff, and without the benefit of complete and accurate information.[58] The court added the airline's responsibility for the safety of its passengers is so important a judge or jury should be wary of second guessing the carrier's judgment " 'months later in the calm of the courtroom.' "[59]

*Smith v. Comair, Inc.*[60] presents an entirely different factual situation. In *Smith* the passenger sued the airline for breach of contract, false imprisonment and emotional distress because the airline had refused to permit him to reboard his flight after a layover. At the point of his original departure the airline had failed to ask for proof of his identification.[61] When detained during the layover the passenger admitted he could not independently confirm his identity. He had left his driver's license in the glove compartment of

[55]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d 42.

[56]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d at page 49 [444 N.E.2d at page 25].

[57]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d at page 48 [444 N.E.2d at page 25] ("Applying this standard to the facts of this case, we hold that, as a matter of law, defendant did not abuse its discretion in refusing to transport plaintiff to New York.")

[58]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d at page 47 [444 N.E.2d at page 24].

[59]*Adamsons v. American Airlines, Inc., supra*, 58 N.Y.2d at page 48 [444 N.E.2d at page 25], quoting *Cordero v. CIA Mexicana de Aviacion, S.A.* (C.D.Cal. 1981) 512 F.Supp. 205, affirmed in part, reversed in part by *Cordero v. CIA Mexicana de Aviacion, S.A., supra*, 681 F.2d 669.

[60]*Smith v. Comair Inc., supra*, 134 F.3d 254.

[61]*Smith v. Comair Inc., supra*, 134 F.3d at page 256.

his car then parked at the airport and did not carry either his birth certificate or Social Security card on his person. The passenger was eventually permitted to return home.[62]

The appellate court concluded the passenger's claims were either preempted or not actionable and granted summary judgment in favor of the airline. In so doing the court noted, "Air travel in modern society presents formidable safety and security concerns and often passengers with criminal intentions are the source of that threat. Federal law—in conjunction with its broad preemption of state-law claims related to airlines' services—appropriately grants airlines latitude in making decisions necessary to safeguard passengers from potential security threats. Section 44902(b) recognizes airlines' boarding practices as a specific area of federal concern."[63] Because the passenger had breached the airline's security measures, the court held the airline was justified in refusing him passage.[64]

By contrast, where an airline refused to allow a passenger to reboard the plane after a stopover on grounds he had insulted the captain and crew, the court in *Cordero v. CIA Mexicana de Aviacion, S.A.*[65] upheld the jury's finding the airline had acted unreasonably in failing to investigate the passenger's claim he had been mistaken for another disorderly passenger. Accordingly, the court found 49 United States Code section 44902 did not shield the airline from liability. On a flight, which had already been delayed, the pilot announced an unscheduled stop and one passenger shouted insults at the pilot.[66] At the airport during the stop, the plaintiff circulated a petition complaining about the delay. Airline personnel then prevented the plaintiff from reboarding, claiming he was the one who had insulted the pilot. The airline refused to investigate his claim of mistaken identity and excluded him from the flight.[67] The Ninth Circuit reversed the judgment notwithstanding the verdict in favor of the airline, finding ample evidence in the trial record from which the jury might have concluded the airline acted unreasonably in

---

[62]*Smith v. Comair Inc., supra,* 134 F.3d at pages 256-257.

[63]*Smith v. Comair Inc., supra,* 134 F.3d at page 258.

[64]See also *Sedigh v. Delta Airlines, Inc.* (E.D.N.Y. 1994) 850 F.Supp. 197, 201-202 (airline acted reasonably in removing passenger personnel noticed was nervous, sweating profusely, making several long trips to the lavatory without flushing the toilet and was overheard saying something about killing Jews); *Zervigon v. Piedmont Aviation, Inc.* (S.D.N.Y. 1983) 558 F.Supp. 1305, 1307 (airline's actions in removing a group of eight passengers was reasonable as a matter of law because one assaulted a flight attendant and others in the group were overheard talking about sharing their experience on the flight with friends in the "capital," leading other passengers, crew and the pilot to believe the group intended to hijack the plane to Cuba).

[65]*Cordero v. CIA Mexicana de Aviacion, S.A., supra,* 681 F.2d 669.

[66]*Cordero v. CIA Mexicana de Aviacion, S.A., supra,* 681 F.2d at page 670.

[67]*Cordero v. CIA Mexicana de Aviacion, S.A., supra,* 681 F.2d at page 670.

excluding the plaintiff "without even the most cursory inquiry into the complaint against him."[68]

*Schaeffer v. Cavallero*[69] is another decision in which the court found an airline had failed to demonstrate a reasonable basis for refusing passage. In *Schaeffer* a passenger became very upset when a flight attendant told him one of his two bags had to be checked. He relented but when he did not receive a receipt for his bag he "so vociferously pursued his demand for the receipt" he was asked to deplane.[70] He refused to leave the plane and had to be physically removed by the police. The passenger brought suit for battery, false imprisonment and other claims. The trial court denied the airline's motion for summary judgment finding it a triable issue of material fact whether the airline had acted reasonably. The court found a reasonable jury could conclude he was removed from the plane, not because he posed a safety risk, but in retaliation for his verbal protests, in which case the airline's action would be arbitrary and capricious.[71]

After trial the court clarified its rulings. The court acknowledged airlines have broad discretion under 49 United States Code section 44902 to refuse to transport passengers the airline believes are or might be inimical to safety. "But to say (as defendants essentially argue) that any time an impolite or unpleasant passenger debates a non-safety issue with an airline employee in a boisterous or abusive manner he automatically poses a potential threat to safety would be in effect to set no meaningful limits to the carrier's exercise of its discretion and thus to eliminate the statutory standard altogether. Where no safety issue is reasonably implicated, even grouches have a right to gripe without being grounded."[72] Nevertheless, the court held the passenger could not prevail on his battery and false imprisonment claims. The court found because the passenger had refused to leave the plane on his own, "require[ing] the police to effectuate the removal was the sole proximate cause of the police-related torts of which he complains. By opting for the method of disembarkation that could result in additional injuries," the passenger had assumed and consented to the risk.[73]

In the present case, by contrast, the record evidence establishes as a matter of law Ms. Rubin presented a safety risk which justified United's decision to

---

[68]*Cordero v. CIA Mexicana de Aviacion, S.A., supra*, 681 F.2d at page 672; see also *Rombom v. United Airlines, Inc.* (S.D.N.Y. 1994) 867 F.Supp. 214, 225 (airline's motion for summary judgment denied where passenger who airline accused of being boisterous and failing to follow directions claimed the airline had her arrested out of spite and maliciousness unrelated to any safety or security reason).

[69]*Schaeffer v. Cavallero* (S.D.N.Y. 1999) 54 F.Supp.2d 350.

[70]*Schaeffer v. Cavallero, supra*, 54 F.Supp.2d at page 351.

[71]*Schaeffer v. Cavallero, supra*, 54 F.Supp.2d at page 351.

[72]*Schaeffer v. Cavallero, supra*, 54 F.Supp.2d at page 352.

[73]*Schaeffer v. Cavallero, supra*, 54 F.Supp.2d at page 352.

remove her from the plane. Unlike the situation in *Schaeffer v. Cavallero* Ms. Rubin was not simply loudly belligerent about a nonsafety matter. Also unlike *Cordero v. CIA Mexicana de Aviacion, S.A.* this was not a case of misidentifying the objectionable passenger. Nor did Ms. Rubin present any evidence tending to suggest United ejected her from the flight simply to retaliate against her for arguing with the purser. Instead the evidence demonstrates Ms. Rubin committed what in the industry is considered a serious breach of security by making or attempting to make an unauthorized entry into the first-class cabin. In addition, the evidence demonstrates Ms. Rubin deliberately and repeatedly refused to follow directions from any of the uniformed airline personnel regarding the safety issues of proper stowing of luggage and emergency row seating.

In his deposition testimony the service director explained airlines had developed a heightened sensitivity to safety issues after events such as the Gulf War, the Oklahoma City bombing, the bombing of the World Trade Towers, and the explosion of Pam Am flight 103 over Lockerbie, Scotland. As a result of these events airlines learned they had become potential targets, and at the direction of the Federal Aviation Administration, airlines and airports started taking safety issues much more seriously. According to the service director, it was for this reason the purser perceived Ms. Rubin's unauthorized intrusion, or attempted intrusion, into the first-class area as a threatening act. All seats in first class were occupied; thus all the purser knew was someone was attempting to enter the forward cabin who clearly had no business being there. The service director stated "the hair came up on the back of his neck" as he watched Ms. Rubin drop her bag and "run into" first class. Instead of leaving the area as directed Ms. Rubin argued loudly with the purser for several minutes and insisted she be permitted to fly in the fully occupied first-class cabin. Even Ms. Rubin described the argument as a "confrontation."

Although the service director intervened in an attempt to accommodate Ms. Rubin she refused to follow his directions as well. She refused to stow her bag as directed, and in fact told the director if he did not want the bag in the doorway, he could stow it himself. The director told Ms. Rubin her assigned seat was 26B. Ms. Rubin refused to go to the back of the plane and instead sat in an empty seat immediately behind the first-class cabin. United personnel told Ms. Rubin she could not sit in the emergency row bulkhead seat and repeatedly asked her to move. According to the service director, given her demonstrated unwillingness to follow directions, Ms. Rubin was not considered "emergency row qualified." It was only after much pleading Ms. Rubin finally moved. However, she still refused to follow orders to sit in seat 26B. She instead moved a bit further back and sat in someone's seat

who was then in the lavatory. When the person returned from the lavatory, United personnel had to again request Ms. Rubin to leave the seat.

In the meantime the purser alerted the pilot who came out of the cockpit to assess the situation. The flight was already considerably delayed and many passengers were becoming upset and unruly. The pilot, purser and service director conferred and decided Ms. Rubin should be removed from the flight.[74] As the service director described the situation, "it was unacceptable behavior, it was unsafe behavior. I had a riot going on, just about, and this is where I draw the line."

Ms. Rubin refused to comply with the gate agent's request to leave the plane voluntarily. In fact, she refused to stop talking on her cell phone long enough to even acknowledge his presence. The gate agent testified he thought Ms. Rubin could have been a danger to other passengers on the airplane because of her "aggressive behavior." The gate agent reasoned, "She wouldn't listen. She wouldn't listen to the uniform[ed] crew member[s], she wouldn't listen to the service director. She was very loud. And in her conversation on the phone, that was very loud, and completely ignoring my presence less than 20 inches from her, looking her dead in the eye . . . ."

United personnel then summoned the assistance of the Los Angeles Airport Police Department. Given the length of the delay of 20 to 25 minutes, and the volatile situation they discovered on board, the police officers were ready to arrest Ms. Rubin and file charges against her for obstructing a flight crew.[75] Indeed, one of the officers believed because so many of the passengers were angry at Ms. Rubin her own personal safety would have been at risk had she remained on the flight.

---

[74]Although a pilot necessarily relies in part on the purser and operations director in making the decision to deplane a passenger, a pilot has ultimate responsibility for the overall safety of the aircraft, its crew and passengers. (See 14 C.F.R. § 121.537(d) (2001) [pilot has complete control over and responsibility for all passengers and crew "without limitation"].) The Federal Aviation Administration has enacted numerous regulations granting considerable discretion to airlines and pilots to control dangerous or unruly behavior. For example, regulations grant authority (1) to the pilot and crew members to prohibit anyone from interfering, intimidating or threatening a crew member or interfering with his or her duties (14 C.F.R. §§ 91.11, 121.580 (2001)); (2) jointly to the pilot and director of operations for the initiation, continuation, diversion or termination of a flight (14 C.F.R. § 121.537(b) (2001)); (3) to the pilot to ensure no flight crewmember is engaged in any activity which might distract the person from his or her duties during a critical phase of the flight. (14 C.F.R. § 121.542(b) (2001); see generally Weigand, Air Rage and Legal Pitfalls for State-Based Claims Challenging Airline Regulation of Passenger Conduct During Flight (2001) 45-Jun B. B.J. 10.)

[75]The FAA makes it a criminal offense for a person to assault or intimidate a member of the flight crew in any way which interferes with his or her ability to perform his or her duties. Title 49 United States Code section 46504 provides: "An individual on an aircraft in the special aircraft jurisdiction of the United States who, by assaulting or intimidating a flight

In short, the undisputed evidence establishes Ms. Rubin did, or at least attempted to, make an unauthorized entry into the first class forward cabin area, which airline personnel consider a threatening act. Moreover, the undisputed evidence establishes Ms. Rubin repeatedly and deliberately refused to comply with any of the directions from any of the airline personnel regarding safety issues. This evidence in combination, coupled with the unruly and potentially dangerous situation she helped create on board, is sufficient as a matter of law to establish United when it made its decision had a reasonable basis for believing Ms. Rubin, was, "or might be, inimical to safety,"[76] which in turn justified removing her from this particular flight.

Ms. Rubin's allegedly triable issues of fact, for example, whether the flight was already somewhat delayed, whether the outraged purser unilaterally decided to have her ejected, or whether the passengers instead applauded because they were promised a free movie, are too immaterial to alter this conclusion.[77] Accordingly, we further conclude the trial court correctly granted judgment in United's favor and dismissed the action.

## Disposition

The judgment is affirmed. Respondent is awarded costs on appeal.

Woods, J., and Perluss, J., concurred.

---

crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, shall be fined under title 18, imprisoned for not more than 20 years, or both. However, if a dangerous weapon is used in assaulting or intimidating the member or attendant, the individual shall be imprisoned for any term of years or for life." (See also cases collected in Mann, All The (Air) Rage: Legal Implications Surrounding Airline and Government Bans on Unruly Passengers in the Sky (Fall 2000) 65 J. Air L. & Com. 857.)

[76]49 United States Code section 44902(b) [an air carrier "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety"].

[77]Similarly, the fact or result of the parties' prior arbitration is irrelevant to this proceeding.